IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HEALTHY HOME 365, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| AIR AI TECHNOLOGIES, INC f/k/a | § | Case No.: 3:24-cv-1481 |
| AIR AI, LLC, APEX HOLDINGS | § | |
| GROUP, LLC., CALEB MATTHEW | § | |
| MADDIX, RYAN PAUL O'DONNELL, | § | |
| and JOSEPH "JOEY" WESTERN | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

Healthy Home 365, LLC ("HH365" or "Plaintiff") hereby files Plaintiff's Original Complaint ("Complaint") against Defendants Air AI Technologies, Inc. f/k/a Air AI, LLC, APEX Holdings Group, LLC, Caleb Matthew Maddix, Ryan Paul O'Donnell, and Joseph "Joey" Western and, in support hereof, respectfully shows the Court the following:

## I.
## PARTIES

1.      Healthy Home 365, LLC is a Texas limited liability company with its principal place of business in Dallas County, Texas.

2.      Caleb Matthew Maddix ("Maddix") is a natural person residing in Arizona who may be served at 4742 N 24th Street, Suite 300, Phoenix, Maricopa County, Arizona 85016. According to an article Maddix drafted in third person and published on Medium.com on January 4, 2024:

> In the dynamic realm of entrepreneurship and motivational speaking, Caleb Maddix stands as a luminary, leaving an indelible mark on the world. At the helm of Air AI as its CEO and co-founder, Caleb has not only revolutionized the landscape of conversational AI but has also become a prominent figure in the realms of personal development, leadership, and business.

The Mini Bio "Team Maddix" posted on the Internet Movie Database ("IMDb") website represents Maddix:

> is the CEO of Air AI, is a keynote speaker, Internet personality, actor and businessman who authored his first book at age 14, became a millionaire at 16 & leveraged social media to build a personal brand while sharing stages with Gary Vaynerchuk, Grant Cardone, Kevin Harrington, Tony Robbins & more. He has been featured in Forbes, Huffington Post, Entrepreneur and has been named in the "Top 20 Most Motivational Influencers on the Planet," and "Top 30 Entrepreneurs Under 30" for his work.

3.      Ryan Paul O'Donnell ("O'Donnell") is a natural person residing in Arizona who may be served at 4742 N 24th Street, Suite 300, Phoenix, Maricopa County, Arizona 85016. O'Donnell, like Maddix, made his name in marketing and sales. At least one AirAI promotional web posting represents that internet marketing authority Frank Kern called O'Donnell "the most natural born marketer I've ever met in my entire life" and quotes self-help guru Dean Graziosi as follows: "I trusted Ryan O'Donnell with $220,000/week in Adspend when he was just 18. There's so many lessons we can learn from this kid. . ."

4.      Joseph "Joey" Western ("Western") is a natural person residing in Arizona who may be served at 4742 N 24th Street, Suite 300, Phoenix, Maricopa County, Arizona 85016. Prior to being brought on at AirAI as the Director of the Agency Program, Western worked with Maddix and O'Donnel for approximately 14 months at another company they formed, own, and operate called Scale 13. Western, like O'Donnell and Maddix, has a strong presence in the world of internet/social media marketing and sales.

5.      Air AI Technologies, Inc. f/k/a Air AI, LLC ("AirAI") is a Delaware corporation,

with its principal place of business at 4742 N 24th Street, Suite 300, Phoenix, Maricopa County, Arizona 85016. AirAI may be served through its agent for service Incorporating Services, Ltd., 3500 S. Dupont Hwy, Dover, DE, 19901. O'Donnell and Maddix formed Air AI, LLC as an Arizona limited liability company on February 9, 2023. A year and two weeks later, they converted Air AI, LLC into a Delaware Corporation named Air AI Technologies, Inc. to support additional legal capital raises through the issuance of stock.

6.  Apex Holdings Group, Inc. f/k/a Apex Holdings Group, LLC ("Apex") is a Delaware corporation, with its principal place of business at 4742 N 24th Street, Suite 300, Phoenix, Maricopa County, Arizona 85016. Apex may be served through its agent for service Incorporating Services, Ltd., 3500 S. Dupont Hwy, Dover, DE, 19901.

7.  Upon information and belief, AirAI is a wholly owned subsidiary of Apex. Maddix and O'Donnell control Apex and AirAI and/or use these entities as instrumentalities for the transaction of their own affairs. As Apex and AirAI act as alter egos for Maddix and O'Donnell, holding only the entities liable would be an injustice to HH365. Maddix, O'Donnell, Western, AirAI, and Apex are collectively referred to herein as ("Defendants").

## II.
## JURISDICTION AND VENUE

8.  This Court has original jurisdiction over this action because of the diversity of citizenship of the parties and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.  Venue is proper in this district because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

10. At all times relevant to this dispute, Western acted on behalf of Apex, AirAI,

Maddix, and/or O'Donnel (in addition to acting in his own self-interest).

11.     This Court has specific personal jurisdiction over AirAI, its agents, and alter egos because, for among other reasons, Apex, AirAI, Maddix, O'Donnell, and Western directed the misleading marketing videos discussed below to citizens of the State of Texas; Western called Dalida and Kraskin in Dallas County, Texas on behalf of, among others, AirAI, Maddix, and O'Donnell multiple times for the purpose of convincing them to invest $100,000 into AirAI by way of purchasing one of only 100 "exclusive" AirAI Licenses; Western sent the Air Agency License Agreement to Dalida in Dallas County, Texas for him to sign in his capacity as the CEO of HH365; and per Western's request, Dalida executed the Air Agency License Agreement in Dallas County, Texas (the Air Agency License Agreement executed by Dalida and representations Western made to Dalida and Kraskin are collectively referred to as the "AirAI Agreement"), and HH365 transferred a total of $100,000 from its bank in Texas to AirAI.

## III.
## BACKGROUND

**A.   HH365**

12.     Dalida and Kraskin have been business partners since they were 27 and 28 respectively. They started HH365 as a wholesaler of predominately energy efficiency products ("HH365 Products"). HH365 makes money selling HH365 products to Authorized Independent Dealers ("Authorized Dealers") who, in turn, market and sell HH365 products to the public—and install or coordinate the installation of same. HH365's Authorized Dealers market themselves by mailing flyers that offer a free dinner for attending a presentation on HH365 products ("Dinner Program"). While Dalida and Kraskin formed and operate/operated several companies other than HH365, the only one of relevance here is the Authorized Dealer they started in early 2018.

13.     By 2020 Dalida and Kraskin had built HH365 and its Authorized Dealer into

profitable companies with significant revenues that allowed them to both reinvest in the companies and to treat the approximately 80-100 people working for their collective companies on all-inclusive yearly trips including a Caribbean cruise, four-day trip to Jamica, and four-day trip to Cancun.

14.     As Covid worked its way across the country, the opportunities for Dinner Program presentations became far and few between. By April, HH365's and its Authorized Dealer's combined revenue stream—that Dalida and Kraskin worked so hard to build—had effectively run dry. Committed to keeping their core employees together, some of whom had been working for them for several years, Dalida and Kraskin formed several new companies in the early 2020s—some of which failed or barely survived, others of which are fiscally healthy to thriving.

15.     After restaurants opened back up for group dinners and the fear of indoor group activity waned in 2021, HH365's Authorized Dealers cautiously got back to work. By mid-2023, with Covid in the rearview mirror, HH365 and the Authorized Dealer Dalida and Kraskin operated were closing in on pre-Covid revenues.

**B.     AirAI**

16.     On or about February 9, 2023, Maddix and O'Donnell formed AIR AI, LLC (as an Arizona limited liability company) to operate as an "AI Powered Software Suite" based on conversational artificial intelligence ("CAI"). Having no programming or software engineering background to speak of and knowing little about artificial intelligence, and less about CAI, Maddix and O'Donnell hired programmer Michael Su ("Su")—who became AirAI's Chief Technology Officer—to program/engineer the software that would be the foundation of the CAI AirAI planned to package and sell to investors like HH365 by way of license agreements.

17.     Unphased by their fundamental lack of understanding of what they would

actually be selling, over the course of several months, Maddix, O'Donnell, Western, and a few others in Maddix's and O'Donnell's inner circle created marketing videos that, for example, misleadingly made it appear as if Tesla was already using AirAI's CAI to cold call potential purchasers and set appointments[1] and that Apple was using AirAI's CAI to make calls to individuals who had viewed Vision Pro goggles online and convince them to finance the $3,000 purchase over time instead of paying cash.[2]

18.    With hubris stacked on hubris, Maddix, O'Donnell, and Western prepared sales scripts claiming AirAI had already reached goals that were merely aspirational at the time. Their "fake it 'til you make it" marketing approach included, as discussed below, calculated misrepresentations that Callaway Golf and Hard Rock Casino had already successfully deployed AirAI's CAI and that Facebook and Red Bull were interested.

19.    Despite their collective lack of understanding of the technology behind CAI Su was attempting to engineer into a useful product, or a realistic timeline for same (assuming Su could deliver), in late summer/early fall 2023, Maddix, O'Donnell, and members of their inner-circle leveraged their combined social media presence to flood Facebook, X, Instagram[3] and other social media platforms with the above-described misleading marketing videos designed to attract the attention of younger and aggressive potential investors.

20.    Dalida first noticed the videos late August while scrolling through Facebook. Being an entrepreneur with hopes of someday selling one or more of the entities he and Kraskin created for a substantial sum, Dalida found the idea of getting in early on AI technology that had

---

[1] As of the date of the filing of this Complaint, this video is available at https://www.tiktok.com/@donnellycss/video/7256735379275943194?lang=en.

[2] As of the date of the filing of this Complaint, this video is available at https://www.youtube.com/watch?v=uL0ViTaiTNw.

[3] At the time of the filing of this Complaint, Maddix had over 225,000 Facebook followers, 11,100 followers on X (formerly twitter), and over 76,600 followers on Instagram.

already been implemented/vetted by Telsa and Apple to be nothing less than thrilling and reached out for more information. AirAI assigned salesman Joey Western ("Western") to pitch and close Dalida and Kraskin.

**C.     The Sell**

21.     Over the course of approximately four phone calls from late August to mid-September, Western wildly misrepresented the operational status, functionality, and integration capabilities of AirAI's CAI to Dalida and Kraskin.

22.     Among other representations, Western told Dalida and Kraskin AirAI was "lightyears ahead of any other company in the market", "innovating extremely quickly", and "in a really unique place" because there is "zero competition for the technology we have". Carrying on with the Apple/Tesla ruse, Western compared the opportunity to purchase one of the first 100 unique AirAI licenses to being a seed investor in Apple or Tesla.

23.     He went on to represent that AirAI's CAI had already been successfully deployed in multiple scenarios, was being used by Callaway and Hard Rock Casino, that Facebook was "interested in rolling it out", and that "Red Bull reached out a few days ago." Western further represented that several then-current AirAI license holders were in the process of onboarding "big fish", while others were already charging monthly retainers or $100,000 set up fees.

24.     To assuage Dalida's and Kraskin's concern regarding HH365's complete lack of experience with conversational AI, Western represented AirAi: (1) would be providing HH365, like it does every license holder, "done for you", "ready to launch" demos, automations, and funnel templates; (2) was "going to be right there by [HH365's] side" guiding its employee of choice through the "tons of information" available at Air University including "everything from ad strategies on Facebook, YouTube, Instagram to . . . organic strategies and things like that

and how to build your agency for automation"; and (3) was in the process of implementing weekly "consulting calls . . . for like specific things, whether it be like marketing or, you know, setting up your agency for automation, how to set up your agent to book appointments for your closers, things like that."

25.   With Dalida and Kraskin still on the fence,[4] Western closed the deal when he told them "[AirAI] might have like 15 [licenses] left" on September 14, 2023. Believing this, as well as numerous other representations made by Western, Dalida and Kraskin greenlighted HH365 to pay $100,000 to AirAI for one of "only 100 Air Agency Licenses."

26.   The Air Agency License Agreement Dalida signed on behalf of HH365 included many of the promises Western made to Dalida and Kraskin to induce Dalida to execute the agreement on behalf of HH365. For example, it promised to provide HH365 with "[h]ands on training" that would mold HH365's chosen employees into some "of the best in the world at conversational AI & implementing it for your clients" and "DFY [done for you] demos, funnel templates, automations, Air scripts & agents to get clients. . ."

27.   Of note, at no point did Western, or anyone else affiliated with AirAI, inquire as to whether Dalida or Kraskin were accredited investors.

D.   **AirAI Fails to Deliver on its Promises**

28.   The done for you, ready to launch demos, automations, and funnel templates Western promised required weeks of in-house work and technical troubleshooting to get them to the point of being potentially useful.

29.   The "proprietary" training materials and videos Western promised would make HH365 "experts" in conversational AI—most of which appeared to be recycled from prior

---

[4] By this time, HH365 had pay two refundable $5,000 deposits to keep its option to purchase the license open.

businesses—were rudimentary at best. The license holder specific "hands-on" training promised by Western was general, scripted, and left HH365 with more questions than answers.

30.     In addition to the above, the most common response from the dedicated tech support "team" that Western promised would quickly troubleshoot any unexpected issues was, to paraphrase, "we're working on it . . . not sure how long it will take."

31.     With no experience in conversational AI, little help from AirAI, and $100,000 less in its bank account, HH365 was left with no choice but to dedicate 60-70% of its two most technologically savvy employees' time to engineer prompts and scripts, CRM custom automations/integration, and figure out how to train AI bots for specific uses (*e.g.*, seamlessly booking appointments or answering customer service calls) over months of trial and error. Unfortunately, even with all this work, the ongoing technical issues with the AirAI CAI (that were completely out of HH365's control) left HH365 with, at best, a beta test project not worth marketing to potential clients.[5]

32.     At the end of the day, HH365 was entirely dependent on AirAI to provide a fully functional conversational AI platform and to teach HH365 how to train AI agents to act as booking agents or to answer customer service calls. The common enterprise funded by AirAI license holders such as HH365, is the ongoing development of the conversational AI that AirAI sold to HH365—through the Air Agency License—as a ready to use product.

33.     Adding insult to injury, it appears Western's promise that AirAI would never offer any license comparable to the original 100 was yet another misrepresentation.

## IV.
## CAUSES OF ACTION

---

[5] It should be noted in this regard that AirAI's answer to similar concerns raised by other license holders during the Air Support calls was to keep marketing and selling AirAI's product because they would be working out the kinks in the meantime. Wanting no part in such a Ponzi scheme, HH365 declined to follow this advice.

A.     **BREACH OF CONTRACT AGAINST AIRAI**

34.     HH365 incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

35.     The AirAI Agreement is a valid and enforceable contract. HH365 has fulfilled all conditions precedent to pursuing the causes of action pled in this lawsuit and fully performed its obligations in the AirAI Agreement, except for those obligations waived or excused by AirAI. AirAI materially breached the AirAI Agreement by, among other things, failing to live up the various promises contained therein including to provide HH365 with "[h]ands on training" that would mold HH365's chosen employees into some "of the best in the world at conversational AI & implementing it for your clients" and the "DFY demos, funnel templates, automations, Air scripts & agents" HH365 could use to market AirAI's CAI.

36.     As a direct and proximate consequence of AirAI's material breaches of the AirAI Agreement, HH365 suffered, and continues to suffer, damages in an amount in excess of the minimum jurisdictional limits of this Court. In addition to the above, HH365 had to redirect a significant amount of its General Counsel's time and effort into litigating this matter. HH365 is seeking to recover the value of its General Counsel's time and effort as attorneys' fees under Federal Rule of Civil Procedure 54(d)(2)(A) and Texas Civil Practice & Remedies Code §38.000 *et seq*. HH365 has given Defendants proper notice of and met all conditions precedent to pursuing attorneys' fees in this proceeding.

B.     **FRAUD/FRAUDULENT INDUCEMENT**
       **AGAINST AIRAI, MADDIX, O'DONNELL, AND WESTERN**

37.     HH365 incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

38.     As discussed above, AirAI made numerous material misrepresentations and

omissions to Dalida and Kraskin to induce HH365 to enter into the AirAI Agreement (*e.g.*, through the marketing videos created by Maddix, O'Donnell, Western, and others suggesting Tesla and Apple were already working with AirAI and Western who wildly misrepresented the operational status, functionality, and integration capabilities of AirAI's CAI to Dalida and Kraskin on multiple occasions).

39. At the time AirAI and Western—on behalf of himself, Maddix, O'Donnell, and AirAI—made these material representations, they knew they were false, made them in bad faith, or made them with a conscious indifference to their truth or falsity. AirAI and Western made these fraudulent representations and/or omissions of material fact to induce HH365 to enter into the AirAI Agreement.

40. HH365 relied on these misrepresentations and/or omissions. As a result, HH365 entered into the AirAI Agreement, paid $100,000 to AirAI, and invested a significant amount of human (and other) capital into creating marketable conversational AI agents on a platform AirAI created that would not fully support the conversational AI agents trained-up by HH365. HH365 would not have, among others, entered into the AirAI Agreement, paid $100,000 to AirAI, and invested a significant amount of human (and other) capital into creating marketable conversational AI agents, had it known of the falsity of AirAI's and Western's representations and/or AirAI's and Western's omissions of material fact.

41. As a direct and proximate result of HH365's justifiable reliance on AirAI's and Western's misrepresentations and/or omissions of material fact, HH365 has suffered, and continues to suffer, substantial damages in excess of this Court's minimum jurisdiction. Accordingly, HH365 is entitled to . Moreover, AirAI made these

misrepresentations and/or omissions intentionally, willfully, and/or with reckless disregard of HH365's rights and welfare. HH365 is therefore entitled to multiple/special/exemplary/ punitive damages from AirAI.

C.   **SECURITIES FRAUD**

**Violations of Section 10(b) and Rule 10b-5 Against All Defendants**

42.   HH365 incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

43.   The AirAI Agreement Western sold to HH365 on behalf of Apex, AirAI, Maddix, O'Donnell, and himself is an investment contract as that term is defined in this district because it required HH365's investment in a common enterprise in which HH365 was completely dependent on AirAI to provide a fully functional conversational AI platform and to teach HH365 how to train AI agents to act as booking agents or to answer customer service calls.

44.   As discussed above, Defendants carried out a plan, scheme, and course of conduct that was intended to and did: (a) deceive the investing public—including Dalida and Kraskin; (b) duped HH365 into paying $100,000 to AirAI as part of the AirAI Agreement Western convinced Dalida and Kraskin was a risk-free investment that HH365 would not have paid had it known of Defendants' deception (the "Scheme").

45.   In furtherance of the Scheme, Defendants: (a) employed devices, conduct, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon HH365 and others who were similarly duped into purchasing an AirAI License in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons

as alleged below.

46. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the truth concerning, among other things, the operational status, functionality, and integration capabilities of AirAI's CAI.

47. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors like HH365 that AirAI's CAI remained "lightyears ahead of any other company in the market", "innovating extremely quickly", and "in a really unique place" because there is "zero competition for the technology we have", which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about AirAI's CAI and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of AirAI Licenses.

48. Each of the defendants' primary liability and controlling person liability arises from, among others, the following facts: (a) at all times relevant to this dispute, Maddix and O'Donnell were high-level executives and/or directors at AirAI and members of AirAI's management team and had control thereof; (b) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of AirAI, was privy to and participated in the creation and development of the marketing of AirAI's CAI; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of AirAI's management team, internal reports and

other data and information about AirAI's technological capabilities; and (d) each of these defendants was aware of the AirAI's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

49. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing, among other things, the glacial nature of the ongoing development of AirAI's CAI from the investing public (including Dalida and Kraskin).

50. Moreover, as demonstrated by Western's overstatements and/or misstatements regarding the operational status, functionality, and integration capabilities of AirAI's CAI, assuming *arguendo* that each defendant did not have actual knowledge of the misrepresentations and/or omissions alleged herein, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

51. As a result of the dissemination of materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of an AirAI License was artificially inflated. Ignorant of such facts, and relying directly or indirectly on the false and misleading statements made by Defendants and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, HH365 and others acquired AirAI Licenses at artificially high prices and were damaged thereby.

52. At the time of said misrepresentations and/or omissions, HH365 and other potential investors were ignorant of the falsity of Defendants' statements, believed them to be

true, and relied on them. Had HH365 known the truth regarding the operational status, functionality, and integration capabilities of AirAI's CAI, which were not honestly or accurately disclosed by Defendants, HH365 would not have purchased or otherwise acquired an AirAI License, or, if it had acquired such an investment contract, it would not have done so at the artificially inflated price it paid.

53. Based the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

54. As a direct and proximate result of Defendants' wrongful conduct, HH365 suffered damages in connection with its purchase of the AirAI License. In addition to the economic damages sustained by HH365 in connection with its purchase of the AirAI License, HH365 is entitled to monetary, compensatory, disgorgement, additional economic, and/or consequential damages including lost profits and/or lost opportunity costs. Moreover, AirAI made these misrepresentations and/or omissions intentionally, willfully, and/or with reckless disregard of HH365's rights and welfare. HH365 is therefore entitled to multiple/special/ exemplary/punitive damages from AirAI.

**Violations of Section 20(a) of the Exchange Act Against Maddix and O'Donnell**

55. HH365 incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

56. In addition to the above, Maddix and O'Donnell acted as controlling persons for AirAI and Apex within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the operational status, functionality, and integration capabilities of AirAI's CAI and intimate knowledge of the false representations disseminated to the investing public. Maddix and O'Donnell had the power to influence and control and did influence and control, directly or

indirectly, the decision-making of AirAi—including its agents such as Western—and Apex, including the content and dissemination of the marketing materials and representations which HH365 contends are false and misleading. Maddix and O'Donnell were provided with or had unlimited access to copies of each and every representation alleged by HH365 to be misleading prior to and/or shortly after these marketing materials were issued or statements were made and had the ability to prevent the issuance of such misleading marketing materials and/or statements or cause the materials and/or statements to be corrected.

57. In particular, Maddix and O'Donnell had direct and supervisory involvement in the day-to-day operations of AirAI and Apex as well as control over what Western (and other agents of AirAI) could and could not represent in connection with the sale of AirAi Licenses; and, therefore, had the power to control or directly influence the actions giving rise to the securities violations alleged herein, and exercised same.

58. As set forth above, AirAI, Apex, and Western each violated section 10(b) and Rule 10b-5 of the Exchange Act by their acts, representations, and/or omissions; HH365 reasonably relied on AirAI's, Apex's, and Western's material acts, misrepresentations, and/or omissions; and HH365's reliance on AirAI's, Apex's, and Western's material acts, misrepresentations, and/or omissions directly and proximately caused damages to HH365 that HH365 is requesting be awarded to it in this proceeding.

59. By virtue of their position as controlling persons, pursuant to Section 20(a) of the Exchange Act, Maddix and O'Donnell are jointly and severally liable for all damages awarded to HH365 in this proceeding related to Defendants' violations of securities laws.

D. CONSPIRACY AGAINST ALL DEFENDANTS

60. HH365 incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

61.  As noted above: Maddix, O'Donnell, Western, AirAI, and Apex are members of a group of individuals and entities (that some of those individuals owned) who conspired to fraudulently induce HH365 purchasing an AirAI License and into entering into the AirAI Agreement; (ii) at least two of the above-listed co-conspirators had a meeting of the minds on the course of action to be implemented in furtherance of the conspiracy; (iii) one or more of the members of the conspiracy committed one or more unlawful, overt acts in furtherance of the conspiracy; and (iv) HH465 has suffered injury as a direct and proximate result of the wrongful act(s).

62.  Accordingly, Maddix, O'Donnell, Western, AirAI, and Apex are jointly and severally liable for all damages awarded to HH365 in connection with the above-pleaded torts.

## V.
## JURY DEMAND

63.  HH365 respectfully requests this Court empanel a lawful jury to hear this case.

## VI.
## REQUEST FOR RELIEF

64.  HH365 respectfully requests this Court enter a judgment in favor of HH365 on its claims and causes of action that:

   a.  awards HH365 monetary, compensatory, disgorgement, economic, multiple, special, exemplary, punitive, and consequential damages including lost profits and/or lost opportunity costs in an amount to be determined by a jury;

   b.  awards HH365 costs (including, without limitation, court costs), expenses, and reasonable attorneys' fees incurred in connection with this action, as well as pre-judgment and post-judgment interest at the highest rates allowed by law;

   c.  orders that Apex, AirAI, Maddix, O'Donnell, and Western are jointly and severally liable for all damages awarded to HH365 in connection with the claims and causes of action it is claiming in this proceeding; and

        d.    awards HH365 such other and further relief, at law or in equity, to which it is justly entitled.

DATED: June 14, 2024

                                          Respectfully submitted,

                                          Healthy Home 365, LLC

                                          By:    <u>/s/ *Robin Bechtold*</u>

                                              Robin G. Bechtold
                                              State Bar No. 24043546

                                        709 N. Glenville Rd., Suite 100
                                        Richardson, Texas 75081
                                        Telephone:  469.899.5203
                                        Email:  robinb@healthyhome365.com

                                        ATTORNEY FOR
                                        HEALTHY HOME 365, LLC